UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
UNITED STATES OF AMERICA

       v.                                                **MOTION FOR BAIL**

ERIC JACOBSON,                                   **12-CR-00432**

                  Defendant.
----------------------------------------------------------------X

       Eric Jacobson, M.D., by his attorney, Bruce A. Barket, respectfully petitions the Court to reconsider its Order of Detention of July 6, 2012 pursuant to 18 USC § 3142(f)(2)(B).  There is new information to refute the government's proffered evidence previously presented to the court, significant changes in circumstances, and major changes in applicable law.  Overall, this petition will demonstrate that the government cannot sustain a case that Dr. Jacobson—lacking an active medical license, DEA registration, medical practice, patients, prescription pads, office, business phone, and employees—presents any danger to the community.

    **I.**      **Background**

       Dr. Jacobson was arrested on a complaint for "conspiracy to illegally distribute a controlled substance" and was later indicted by a grand jury for the same charge in addition to five counts of "illegal distribution of a controlled substance."  He has been detained continuously since his arrest.

       On July 5, 2012, this Court conducted a de Novo review of Magistrate Boyle's Detention Order from June 6, 2012.  As the government conceded, Your Honor recognized that Dr. Jacobson was not a flight risk, holding "[T]his is not a case of flight risk, it is a case of dangerousness."  See Transcript of Proceedings before the Honorable Joseph F. Bianco, United States District Court Judge, 07/05/12, p. 22 (attached as Exhibit A).

1

The Government contended that Dr. Jacobson was a danger to the community and, if released, Dr. Jacobson would either personally or through an intermediary prescribe controlled medications to people who have no medical need. The government insisted that "The danger is his practice. That's the danger." See Transcript of Criminal Cause for Arraignment before the Honorable E. Thomas Boyle, United States Magistrate Judge, 06/06/12, p. 4 (attached as Exhibit B).

In reaching its decision that Dr. Jacobson could not be trusted to comply with a simple Court Order to not issue prescriptions, the Court relied on the government's allegations that after Dr. Jacobson surrendered his DEA Registration, he circumvented his inability to prescribe by hiring Dr. Raskin as a proxy to continue his practice and later hired Nurse Higgins to do the same. The Court found the weight of the evidence "extremely strong." Exhibit A, at 19. The defendant's detention order was then affirmed by the Second Circuit, which failed to find clear error in Your Honor's determination.

The changes in circumstances and law pursuant to this bail motion have occurred within the past ten months of the appellate decision, and although this Court's prior decision was not clearly erroneous based on the limited and false information it had at the time, the evidence available now clearly refutes the government's prior proffers.

It should be noted that despite the hyperbole surrounding Dr. Jacobson's practice the Government Prosecutor has conceded to counsel on numerous occasions that in her view 80% of Dr. Jacobson's practice was perfectly legitimate. He was not running, a "pill mill" as the Government implied in its arguments to the Court. Dr. Jacobson is a well-respected physician who ran a perfectly legal medical practice. No doubt there will be a heated dispute over the 20% of his practice that the Government has alleged is illegal. Those allegations, which Dr. Jacobson

vehemently denies, are the stuff trials are made of, but the mere allegation of some illegality in an otherwise perfectly ethical and legal medical practice ought not to be the basis for pre-trial detention of a well-respected doctor and loving father.

## II. Argument

The Bail Reform Act provides in relevant part for the reopening of a bail hearing, "at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue [of] . . . safety of . . . the community." 18 U.S.C. § 3142(f).

Here, as set forth below, circumstances have changed that allow conditions to reasonably assure the community's safety; and moreover, newly procured and evaluated evidence shows that many of the government's initial contentions to the court were sensationalized or outright false.

### a. Circumstances have changed that reasonably assure the community's safety.

*First*, under New York State's new I-STOP legislation, all pharmacists are now required to verify the DEA number of every prescriber before dispensing controlled medications. Since Dr. Jacobson no longer has a valid DEA registration, no pharmacy can legally fill one of his prescriptions.

Furthermore, if a pharmacist filled a prescription for a controlled medication with Dr. Jacobson's name and DEA number illegally, the government would know about it instantly. During the prior bail hearings, the Court was concerned about "a 30 to 45 day lag" in the government's ability to monitor Dr. Jacobson's prescriptions (see Exhibit A, p. 25). Under the new I-STOP law, pharmacists are now also required to input patient data to the Bureau of Narcotics Enforcement ("BNE") database for every controlled prescription *on the same day they*

*fill it*.[1]

Thus, now there is a real time mechanism available to the government to monitor the illegal writing and filling of any controlled prescription under Dr. Jacobson's name and DEA number.

*Secondly*, Dr. Jacobson's practice has been completely decimated. More than a year has passed since Dr. Jacobson's arrest. Every patient for whom he allegedly acted as a "drug dealer" has by now stopped needing medication or has found another practice. For more than a year, Dr. Jacobson has had no patients, no role in any medical practice, no "proxies," and he has not lived in his home, which has been sold. During this time, all of his correspondences have been monitored by the authorities, and he has never answered his cell phone, which has stopped ringing and has been disconnected for more than a year.

*Thirdly*, Dr. Jacobson is not a threat to seek out new patients because, most notably, he will not be authorized to practice medicine. Voluntarily, he is entering into an Interim Order of Conditions that preclude him from practicing pending medicine the outcome of this case.

*Fourth*, the defense proposes still further restrictions on Dr. Jacobson if he is admitted to bail, in addition to what he agreed to do in his initial application. His family home has been sold and if released he will be living with his in-laws in Queens, who are also his major suretors. Additionally, Dr. Jacobson would post a bond up to $1,000,000, secured by family and friends' homes; stipulate to Orders prohibiting him from providing any medical services in any fashion or prescribing any medication; surrender his passport; and restrict his travel to within the Eastern and Southern Districts of New York.

These conditions, in combination with the aforementioned changed circumstances from a

---

[1] Information available online at the New York State Department of Health's website, http://www.health.ny.gov/professionals/narcotic/pharmacies/.

year ago, will assure that Dr. Jacobson literally cannot write prescriptions, have prescriptions filled personally or by proxy, or see patients in any fashion.

*Fifth*, if Dr. Jacobson is not released it will be impossible for him to participate fully in the preparation of his defense. There are literally thousands of medical charts that must be reviewed carefully by counsel, with Dr. Jacobson. This process is unnecessarily burdened by Dr. Jacobson's incarceration, which requires a commitment of several hours for counsel to spend a relatively short amount of time with him. Despite the facility where he is detained counsel must travel to the facility and wait for the facility to bring Dr. Jacobson to the visiting area. The waiting time before one sees a client can be an hour or more. My last visit on August 15th took 6 hours, for about 2 hours with Dr. Jacobson. The delays from traffic to problems at the jail make visiting a client extremely time consuming and will cause an excessive delay in the preparation for trial. The result will be a much longer time before the defense can be ready for trial. The Court has indicated that because of the pre-trial detention it will accommodate a defense request to move the case to trial as quickly as possible. The irony is that because of the pre-trial detention the defense will require a much greater period of time to become ready for trial. The answer to this dilemma should be that Dr. Jacobson should be released and the court then can move the case to trial relatively soon.

      **b. Many of the government's initial contentions to the Court were either sensationalized or false.**

*First*, the allegation that Dr. Jacobson prescribed 2,000,000 pills is false, as is the allegation that Dr. Jacobson prescribed controlled medication in 2012 after he surrendered his DEA registration. Ms. Gatz herself was involved in the prosecution of Sharon Ferreira, who had stolen and then sold numerous prescription forms under a forgery of Dr. Jacobson's name and DEA number. (See Exhibit C.) This amounted to hundreds of thousands of pills, none of which

should be attributed to Dr. Jacobson.

It is unclear from the records whether the exculpatory information concerning the forgery case being prosecuted by Ms. Gatz was disclosed to the defense or to the Court while the Court was being misinformed of Dr. Jacobson's prescription dates and amounts. See Exhibit D, p. 6. Instead, the government used such misinformation as an aggravating factor for detention— claiming that "the records obtained from the BNE reveal that the defendant continued to personally issue controlled substance prescriptions in 2012, well after he surrendered his DEA license." Id. This amounts to a material misrepresentation, since both the number of pills allegedly prescribed by Dr. Jacobson and those allegedly prescribed in 2012 were aggravating factors used by the Court to rule in favor of detention.

The prosecutors have not, because they cannot, produce one prescription written by Dr. Jacobson in 2012. The simple fact is that after he surrendered his DEA number and was told the next day that he could not revoke the surrender, Dr. Jacobson did not write another controlled prescription. We have conducted an exhaustive search of his medical records and have not found a record for a single prescription written by Dr. Jacobson in 2012. The Government's claim that there are such documents is simply untrue. If there is a prescription with his DEA number on it written in 2012 or presented to pharmacy in 2012, it is a forgery.

***Secondly,*** in an effort to stain Dr. Jacobson's practice with illegitimacy, the government contended that Dr. Jacobson's business was "90% cash," see Exhibit E, p. 16, which is another gross exaggeration. In fact, as the Government knew, or should have known, Dr. Jacobson accepted most major insurance plans. He was paid by insurance companies by at least 40% and perhaps as many as 80% of his patients. Based on a review of 1,960 patient charts, undersigned counsel can affirm that only 9% are verified as cash. 39% are verifiably non-cash, and 52% have

6

no pay source documented. So, contrary to the Government's claim, Dr. Jacobson's practice was not 90% cash.

Furthermore, accepting cash for medical services from the uninsured or as payment toward policy deductibles is not a sign of impropriety. It is common practice among physicians and, far from hiding these transactions, Dr. Jacobson kept records of the cash payments, deposited such cash into his business account, and declared it as income on his tax returns. This entire issue is really nothing more than a red herring bolstered by inaccurate information.

***Thirdly***, with regard to the allegation of using "proxies," it is worth noting that abandoning dependent patients is both extremely dangerous and medically unethical.[2] Thus, out of concern for his patients and his ethical duties as a physician, and in accordance with the advice he received from Attorney Martin, Dr. Jacobson hired another doctor to take over the care of his patients, Dr. Raskin, who quickly compiled a record of medical judgment independent from any intervention from Dr. Jacobson. See Exhibit G, p. 4 (His lawyer said, "I advised Dr. Jacobson that his only two options were to sell his practice or hire another medical doctor with a DEA license to take care of his patients.").

That Dr. Jacobson chose to hire another doctor to meet his patients' needs and adhere to the appropriate ethical mandates demonstrates that rather than possessing an inclination to violate the law, he complies with it. The Government's unproven—and unprovable—assertion that Dr. Raskin was hired to continue a "criminal enterprise" is belied by the prosecution's admission that 80% of the practice was legal and serving real patients with real medical needs. Further, there is no proof that Dr. Raskin prescribed medications at Dr. Jacobson's direction

---

[2] See New York State Dep't of Health, *Understanding New York's Medical Conduct Program, Physician Discipline,* available at: http://www.health.ny.gov/publications/1445/ (noting that doctors may be charged with misconduct for "abandoning or neglecting a patient in need of immediate care"). See also Dr. Jacobson's Letter to the DEA (attached as Exhibit F).

rather than based on Raskin's own medical judgment: the government has not even alleged that Dr. Raskin or Nurse Higgins prescribed medication illegally; and the dispute between Raksin and Jacobson over a handful of patients demonstrates that Raskin was acting on his own. Indeed, Dr. Raskin had to be making his own decisions—on Mondays and Wednesdays he worked alone.

Ironically, Dr. Raskin used the screening tools Dr. Jacobson set up to make the decision to discharge patients. This fact is important because it proves that Dr. Jacobson was, contrary to the hyperbole broadcast by the Government, running a legitimate medical practice with a reasonable and prudent structure to prevent unscrupulous or addicted patients from acquiring prescriptions which were not medically necessary. That Raskin and Jacobson disagreed about discharging patients based on the screening tools instituted by Jacobson does not convert a medical practice into a "criminal enterprise." It simply proves what is already known, that in matters of judgment reasonable people will disagree.

Ultimately, a small number of patients who Raskin wanted to discharge were nonetheless treated by the practice with Nurse Higgins making her own judgment about the medical needs. This was perfectly appropriate. If Higgins agreed that the patient should be discharged, they were discharged. If she disagreed, she continued treating the patient. It surely cannot be the Government's position that once Dr. Raskin made a judgment that a patient should be discharged that that patient was not entitled to the opinion of another health care provider. It is these few patients on whom the government focuses in an attempt to prove that Dr. Jacobson is a danger if released on the very strict conditions proposed. The argument must fail because there is not any proof that retaining these few patients over Dr. Raskin's objections was anything other than a disagreement on medical grounds about a judgment call on the patients' treatment. Indeed, the vast majority of patients Raksin thought should be discharged were in fact discharged.

Most importantly, this dispute, which may or may not play itself out at a trial, only has relevance now if the Government can establish that: 1) there is a medical practice for Jacobson to return to; 2) that Jacobson would hire another doctor to run the practice; 3) that in doing so the other doctor would illegally write prescriptions at Jacobson's direction; and 4) that Jacobson would engage in that conduct.  Of course, the undisputed facts suggest the opposite: 1) Jacobson does not have a medical practice, a medical office, patients, or even a license to practice medicine; 2) it would be impossible for Jacobson to hire another doctor to run a practice that does not exist; and 3) Jacobson will be confined to his home and thus there is no opportunity for him to engage in the illegal conduct the Government purports to fear.  He ought to be released on bail pending the outcome of the trial.

*Fourth*, the Court was misled by the government on an issue that has repeatedly resurfaced to Dr. Jacobson's detriment.  Namely, Dr. Jacobson did not have any custom of leaving prescriptions for controlled medication for pickup at his home.  This occurred for fewer than six patients in twenty-two years.  It also occurred under only the dire circumstances, in which well-known patients already under Dr. Jacobson's care were completely out of medications, in severe pain on weekends when his office was closed.  These rare events were acts of compassion, taken in emergency circumstances, as an absolute last resort.

In any event, Dr. Jacobson will not—and could not—continue treating patients in this manner.  As outlined above, he will be residing with his in-laws and does not have a medical practice with patients that require care.

*Fifth*, the government has insinuated that Dr. Jacobson ran the equivalent of a drug dealing operation.  This claim is directly contradicted by the number of patients who Dr. Jacobson *discharged* with referrals to drug rehabilitation programs because of his suspicion that

9

they were either abusing or diverting the medication he was prescribing.  <u>See</u> Exhibit H, which contains a list of such patients.

It is also contradicted by the strict protocols by which Dr. Jacobson screened new and existing patients, including having patients sign a contract, speaking with patients' prior doctors, reviewing New York State's Controlled Substance Information Program, and subjecting every patient to a drug toxicology test at every visit.  <u>See</u> Exhibit G, p. 5 ("Dr. Jacobson had established a rigorous protocol to identify patients who were drug abusers, or were diverting the medications he prescribed").  <u>See also</u> Sample Agreement with Patients from Dr. Jacobson's practice (attached as Exhibit I).

Finally, most of all, the notion that Dr. Jacobson's practice was just a drug dealing operation is contradicted by the government itself, which has admitted that 80% of the practice was perfectly legitimate.  The disagreement at trial will only concern the remaining 20%.

More generally, the government's allegation that Dr. Jacobson was running a drug dealing operation—or a "pill mill"—is contradicted by the government's gross exaggeration of the number of patients he saw on a daily basis.  The government claims that Dr. Jacobson saw one hundred patients per day, when in fact, based on a thorough review of the records, the average number of patients seen in the Great Neck office was 40% less than that among Tuesdays, Thursdays, and Fridays when the office was seeing patients.  Furthermore, on Tuesdays and Thursdays, Dr. Jacobson had the help of two physician's assistants also seeing patients during the office hours of 8:00 a.m. to 8:00 p.m.  While some visits were as short as several minutes for well-established patients with no new medical issues, other visits were up to an hour for patients with new medical problems and in need of counseling.  This hardly resembles a "pill mill" as insinuated by the government.

***Sixth***, the government contended that Dr. Jacobson attracted patients to his Great Neck office from not only his community but also from remote locations out of state.  See Exhibit A, p. 20.  This is deceivingly incomplete.  Based on a review of all out of state patients, which were only just over 5% of his practice, nearly all (101 out of 130) began as patients in Dr. Jacobson's original office in the Bronx, which was much closer to where these patients lived.  When Dr. Jacobson consolidated the pain management component of his practice to the Great Neck office, most patients under his care for that purpose in the Bronx followed him despite the extra distance.

***Seventh***, the government has still provided no evidence pertinent to an essential element in this case.  Under the law, the government is "required to prove that [the defendant] caused the drugs to be dispensed other than for a legitimate medical purpose, other than in good faith, and not in the usual course of medical practice."  See United States v. Wexler, 522 F.3d 194, 205, 206 (2d Cir. 2008).  Here, the evidence has shown the opposite—that Dr. Jacobson treated patients in unique pain with diligence, compassion, and the absolute best of intentions.  He nevertheless remains not only charged for this offense, but incarcerated leading up to his trial.

### III.    The History and Characteristics of the Defendant

Dr. Jacobson is 51 years old, married, with two young daughters who had been living on Long Island for the past eight years.  He graduated from the top schools in the country, including Vassar College, Mount Sinai Medical School, Long Island Jewish-Albert Einstein internship, and the Columbia Presbyterian Medical Center residency program.  He has been Board Certified by the American Board of Physical Medicine and Rehabilitation for the past 19 years and is considered an expert in his medical specialty.  He has no criminal history and has not a single malpractice judgment against him.

Dr. Jacobson has been incarcerated for approximately fourteen months in Nassau County Jail, GEO Detention Center, and MDC Brooklyn Detention Center. During that time he has had zero violations. To the contrary, he enrolled in the DART program for people with drug and alcohol abuse problems—as part of which he participated regularly, offered counsel to inmates about their drug abuse difficulties, and delivered a one hour lecture on the negative effects of chronic alcohol use.

Meanwhile, as this case slowly progresses, Dr. Jacobson's wife and two young children, Halle (10) and Leah (9), who rely on him for matters of the deepest importance, have lived over a year without their husband and father, who is presumed to be innocent of these charges. Letters to the Court from Halle, Leah, and Ms. Jacobson are attached herein as Exhibits J-K.

### IV. Similarly Situated Defendants

Under the circumstances, this pretrial detention is unusual. The defense has searched the body of federal case law (in vain) for another instance where a physician with absolutely no criminal history, let alone one with the impressive career and personal history of Dr. Jacobson, has been detained before trial when accused of crimes such as those alleged here. On the contrary, the case law reveals that physicians and other health care practitioners accused of this type of offense are admitted to bail on vastly more lenient terms than those proffered by the defense in the instant case. This goes beyond the other cases linked to the case at bar, which have previously been drawn to the Court's attention. See, e.g., United States v. Prejean, CRIM. 05-130, 2005 WL 3543817 (E.D. La. Oct. 21, 2005) (involving a 27-count indictment on conspiracy and illegal distribution charges, supported by evidence from undercover DEA agents, or patients acting as their informants). See also United States v. Armstrong, 550 F.3d 382, 386-87 (5th Cir. 2008) (defendant admitted to bail, and permitted to seek reinstatement of her nursing

license during the pendency of the case).

It also includes a cardiologist, Rohan Wijetilaka, who was alleged to have illegally prescribed oxycodone and other painkillers for six years prior to his arrest, where the defendant a) wrote prescriptions outside the scope of his practice, b) even after his license became suspended, rather than voluntarily surrendered, but c) who was ultimately released in the Southern District of New York on $200,000 bond.[3]

Indeed, even where the allegations are far more serious than those at bar, bail has been granted. In United States v. Green, 5:07-CR-02 WDO, 2007 WL 201266 (M.D. Ga. Jan. 24, 2007), four defendants, a physician, his office manager, his physician's assistant, and a pharmacist were the objects of a 122-count indictment. The indictment alleged the same type of offenses as the ones alleged here, except the allegations included serious bodily harm to "many" individuals—including the death of thirteen people. Some of the counts exposed the defendants to 20 years to life imprisonment. The court found that "[t]he nature of the crimes charged involve conduct that causes a grave concern for the safety of the community." Id. Yet, the physician who had written the prescriptions was released on a secured $250,000 bond, with travel restricted to the State of Georgia. The office manager was released on a secured $50,000 bond with the same travel restrictions. The physician's assistant, who had pre-signed prescriptions, and the pharmacist who had filled them, were both released on secured $100,000 bonds and the same travel restrictions.[4]

Finally, and most recently, Dr. Stan Li was charged with manslaughter after two of his patients were found dead with drug overdoses—one who was found with a bottle of Xanax that

---

[3] See generally, CBS NEW YORK, *Westchester County Doctor Arrested for Allegedly Writing Illegal Painkiller Prescriptions,* 07/26/12, available at: http://newyork.cbslocal.com/2012/07/26/westchester-county-doctor-arrested-for-allegedly-writing-illegal-painkiller-prescriptions/

[4] None of them later violated the terms of their bail.

13

was missing 55 pills from when it was dispensed just three days earlier; and the other who was prescribed 500 pills in the month preceding his death. Nevertheless, pending trial, the New York County Court released Dr. Li on $750,000 bond.[5]

### V.     Conclusion

WHEREFORE, in light of the more restrictive conditions proffered above, combined with the fact that Dr. Jacobson simply has no patients anymore, cannot possibly prescribe controlled medications personally or by proxy, and in any event is subject to a more efficient system of monitoring via I-STOP, the Court is respectfully asked to find that any danger to the community has been obviated, and to grant bail to Dr. Jacobson.

Dated: Garden City, New York
          September 10, 2013

                                        Respectfully submitted,

                                        BARKET MARION EPSTEIN & KEARON

                                By:     /s/ Bruce Barket
                                        Bruce Barket, Esq.
                                        666 Old Country Road, Suite 700
                                        Garden City, New York 11530
                                        (516) 745-1500
                                        bbarket@barketmarion.com

---

[5] See generally Tom Hays, HUFFINGTON POST, *Stan Li, New York City Doctor, Charged with Manslaughter in Overdose Deaths*, 12/06/12, available at: http://www.huffingtonpost.com/2012/12/06/stan-li-new-york-city-doctor-overdose-manslaughter-deaths-charged_n_2251075.html